## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

|  |  |
|---|---|
| In re: | Chapter 15 |
| North Pointe Holdings (BVI) Ltd. (in Liquidation), *et al.*, | Case No. 18-24659-AJC |
| Debtors in Foreign Proceedings.[1] | Jointly Administered |

## MOTION OF THE JOINT OFFICIAL LIQUIDATORS (IN THEIR CAPACITY AS FOREIGN REPRESENTATIVES) FOR ORDER (A) APPROVING COMPROMISE AND SETTLEMENT, (B) ENTERING BAR ORDER IN ACCORDANCE THEREWITH, AND (C) GRANTING RELATED RELIEF

The Joint Official Liquidators (in their capacity as Foreign Representatives) (the "***Liquidators***") for the above-captioned Chapter 15 Debtors file this motion (the "***Settlement Motion***") and request that this Court enter an order substantially in the form attached hereto as **Exhibit A** (the "***Proposed Order***"): (i) approving, pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "***Bankruptcy Rules***"), the Liquidators' compromise and settlement with SGG Management (BVI) Limited ("***SGG BVI***"), SGG Management (Curaçao) N.V. ("***SGG Curaçao***"), Herman Oosten ("***Oosten***" and together with SGG BVI and SGG Curaçao, "***SGG***"), and certain affiliates[2] pursuant to a settlement agreement (the "***Settlement Agreement***") that

---

[1] The "***Chapter 15 Debtors***" are (i) Diversified Real Estate Development Ltd. (in Official Liquidation); (ii) GMS Global Market Step Up Note Ltd. (in Official Liquidation); (iii) Preferred Income Collateralized Interest Ltd. (in Official Liquidation); (iv) Sentinel Investment Fund SPC (in Official Liquidation); (v) SG Strategic Income Ltd. (in Official Liquidation); (vi) Sports Aficionados Ltd. (in Official Liquidation); (vii) Vanguardia Group Inc. (in Official Liquidation); (viii) Vanguardia Holdings Ltd. (in Liquidation); (ix) Spyglass Investment Management Ltd. (in Liquidation); (x) North Pointe Holdings  Ltd. (in Liquidation); (xi) Biscayne Capital Holdings Limited (in Creditor Voluntary Liquidation); and (xii) Biscayne Capital (B.V.I.) Ltd. (in Liquidation).

[2] Saphilux S.à.r.l. ("***IQ-EQ Parent***") is the parent entity to SGG BVI and SGG Curaçao, and is the fourth and final counterparty to the Settlement Agreement. SGG, IQ-EQ Parent, and the Liquidators are referred to herein as the "***Parties***."

settles all claims the Liquidators may assert on behalf of the Note Issuers[3] against SGG, (the "***Liquidators' Claims***"), (ii) issuing a bar order (as defined below, the "***Bar Order***") barring the commencement or continuation of actions against SGG and its Related Parties[4] that are being settled (or which relate to the claims being settled), and (iii) granting such other and further relief as the Court deems just and proper.  A true and correct copy of the Settlement Agreement is attached as **Exhibit B**.

<b><small>PRELIMINARY STATEMENT</small></b>

1.      The Liquidators seek approval of the Settlement Agreement pursuant to Bankruptcy Rule 9019.  The Settlement Agreement is the culmination of a multi-year investigation into SGG's activities related to the Biscayne Capital Scheme (described below), as well as nearly two years of discussions, negotiations, and mediation, assisted by Antonio Piazza, one of the leading mediators in the world.  These efforts resulted in the Parties executing the Settlement Agreement on April 13, 2022.  The Grand Court of the Cayman Islands (the "***Cayman Court***") sanctioned (*i.e.*, approved) the Liquidators' entry into a settlement on the commercial terms set forth in the Settlement Agreement by an order entered on December 13, 2021 (the "***Cayman Approval Order***").  A true and correct copy of the Cayman Approval Order is attached hereto as **Exhibit C**.

2.      Approval of the Settlement Agreement will: (i) favorably resolve disputes which would otherwise take years of litigation to resolve, (ii) eliminate any risk of non-collectability of

---

[3] The "***Note Issuers***" include the following Chapter 15 Debtors: Diversified Real Estate Development Ltd. (in Official Liquidation) ("***Diversified Real Estate***") f/k/a ORC Senior Secured Ltd.; GMS Global Market Step Up Note Ltd. (in Official Liquidation) ("***GMS Global***"); Preferred Income Collateralized Interest Ltd. (in Official Liquidation) ("***Preferred Income***"), Sentinel Investment Fund SPC (in Official Liquidation) ("***Sentinel Investment***"); and SG Strategic Income Ltd. (in Official Liquidation) ("***SG Strategic***").

[4] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Settlement Agreement.

a judgment against SGG, (iii) provide finality related to one facet of an international fraud scheme of extraordinary complexity, and (iv) provide creditors of the Chapter 15 Debtors – the victims of the fraud scheme described herein – with certainty that the losses they may have suffered through SGG related to the Biscayne Capital Scheme will be compensated by tens of millions of dollars. The Settlement Agreement is the culmination of a good faith, arm's length, and mediated negotiation that will result in the recovery of tens of millions of dollars from a third-party service provider for the benefit of hundreds of creditors who are collectively owed, in the Liquidators' estimate, hundreds of millions of dollars from the Principals and other third-party service providers.

3.    The Settlement Agreement requires SGG to pay a total of $22.5 million.  Of that amount, SGG will pay $17.5 million directly to the Liquidators within thirty days of entry of the Proposed Order and will pay an additional $5 million to be held in escrow, which amount may be used by SGG to litigate or settle other claims that have or may be brought against them related to the Biscayne Capital Scheme in contravention of the Bar Order.  Any amounts remaining in the escrow will be paid to the Liquidators no earlier than the first days of 2025.

4.    A critical component of the Settlement Agreement is the entry by this Court of a settlement "***Bar Order***" that is properly and narrowly tailored to the reasonable needs of this case.  Since the collapse of the Note Issuers, certain Noteholders (defined below) have commenced actions to try to recover losses they suffered in connection with their purchase of Notes (defined below).

5.    Certain of those Noteholders – such as the plaintiffs pursuing the Florida Lawsuits (described below) – have commenced litigation that should be brought and resolved for the collective benefit of all Noteholders.  These claims are derivative in nature and most properly

brought by (and settled by) the Liquidators.  These actions involve litigation against third-party service providers arising from the services those defendants provided (or did not provide) to the Note Issuers.  In all instances, the damage alleged by the plaintiffs in these actions is for damage arising from the Note Issuers' inability to repay the Notes.  These actions assert derivative claims that can (and should) be brought only by the Liquidators for the collective benefit of all of the Note Issuers' creditors.

6.      SGG is one of the third-party service providers that has been targeted by Noteholders.  To date, two Noteholder plaintiffs groups have filed cases against SGG – *Rose Financial Limited Partnership, et al. v. South Bay Holding LLC, et al.*, Case No. 2018-035014-CA-01 (Fla. 11th Jud. Cir.) (the "***Romay Lawsuit***") and *Lopez Lincuez, et al. v. Cortes, et al.*, Case No. 2020-004163-CA-01 (Fla. 11th Jud. Cir.) (the "***Lopez Lawsuit***" and together with the *Romay* Lawsuit, the "***Florida Lawsuits***").  The Florida Lawsuits allege that SGG inflicted damage upon the Note Issuers that arises from the Note Issuers' inability to repay the Notes. These claims are: (a) property of the liquidation estates of the Note Issuers that may only properly be brought by the Liquidators (with respect to alleged claims for breach of fiduciary duty asserted in the *Lopez* Lawsuit); or (b) derivative claims that may (and should) be brought only by the Liquidators for the collective benefit of all creditors (with respect to all other claims asserted in the Florida Lawsuits).

7.      A condition to the effectiveness of the Settlement Agreement is that this Court: (a) enter the Bar Order which would bar all Noteholders (among others) from commencing or continuing "Barred Claims" against SGG; (b) bar non-settling co-defendants from pursuing claims against SGG for contribution, reimbursement, or indemnity; and (c) enjoin the continued prosecution of the Florida Lawsuits against SGG.

8.      Entry of the Bar Order is an equitable, essential, and necessary component of the Settlement Agreement.  The authority to enter the Bar Order is well established under Eleventh Circuit precedent.  It will aid the resolution of these complex cross-border cases and ensure that a race to the courthouse by certain Noteholders seeking to enforce claims, which should be brought and resolved through the Liquidations (defined below) will not upset the general scheme of equality of distribution among similarly situated creditors that is central to bankruptcy law. The Bar Order is also an essential and necessary component of the Settlement Agreement for SGG (and its insurers), who would not pay the $22.5 million they have agreed to pay in the Settlement Agreement without it.

**JURISDICTION AND VENUE**

9.      The Settlement Agreement arises in and relates to the Chapter 15 Debtors' cases pending before this Court under chapter 15 of the Bankruptcy Code (the "***Chapter 15 Cases***"). Accordingly, the Court has jurisdiction to consider this Settlement Motion pursuant to 28 U.S.C. § 1334(b), and this matter is properly referred to this Court pursuant to 28 U.S.C. § 157(a) and Rule 87.2 of the Local Rules of the United States District Court for the Southern District of Florida.

10.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (P), and venue is proper before the Court pursuant to 28 U.S.C. § 1410.

11.      The Court has authority to grant the relief requested in this Settlement Motion pursuant to §§ 105(a) and 1521 of the Bankruptcy Code, 28 U.S.C. § 1651 (the "***All Writs Act***"), and Bankruptcy Rule 9019.

<u>FACTUAL BACKGROUND</u>

**A. Formation of South Bay Holdings, Biscayne Capital, the Note Issuers, the Role of SGG, and the Issuance and Marketing of the Notes.**

12.      The "Biscayne Capital Scheme" that underlies this case and the Settlement Agreement concerns a long-running fraud that crosses an extraordinary number of international boundaries.  At the center was a non-debtor entity called South Bay Holdings, LLC ("**SBH**"), a Florida limited liability company,[5] which was formed in 1999 to develop high-end real estate in South Florida.  It was owned by Roberto Cortes and Ernesto Weisson.[6]  Mr. Cortes was indicted, and Mr. Weisson pled guilty to a single count of conspiracy to commit wire fraud on April 20, 2022 related to the Biscayne Capital Scheme.[7]

13.      In its early years, SBH appears to have maintained its focus on developing South Florida real estate, frequently financing its activities through traditional real estate lenders. Starting in 2005, however, Messrs. Weisson and Cortes, together with others, formed a brokerage business that was majority-owned by SBH.  The brokerage business was generally referred to as "Biscayne Capital."  It targeted, primarily, high-net-worth South American individual investors.

---

[5] Since their appointment, the Liquidators have taken control of SBH through assignment.  Currently, 100% of the remaining membership interests are held indirectly by North Point Holdings, Ltd. (in Liquidation), one of the Chapter 15 Debtors.

[6] Mr. Weisson held his interests through a Florida limited liability company, Weisson Holdings, LLC.  Mr. Cortes held his interests through a Florida corporation, Allegiance Partners, Inc.

[7] *See* Case No. 21-cr-458 (E.D.N.Y.). In addition to Mr. Cortes and Mr. Weisson, many other individuals who acted in concert with them related to the Biscayne Capital Scheme were indicted or otherwise had criminal charges brought against them.  Fernando Haberer Bergson was named in the same indictment as Messrs. Cortes and Weisson.  Similarly, on April 4, 2019, Gustavo Trujillo pled guilty to wire fraud and money laundering associated with the Biscayne Capital Scheme. *See* Case No. 19-cr-134 (E.D.N.Y.).  Frank Chatburn pled guilty on October 11, 2019 to money laundering conducted through entities associated with the Biscayne Capital Scheme.  *See* Case No. 18-cr-20312 (S.D. Fla.).  This list of criminal actions related to the Biscayne Capital Scheme is not comprehensive. Collectively, the individuals that carried out the Biscayne Capital Scheme are hereafter referred to as the "***Principals***."

14.    From its inception, Biscayne Capital and its brokerage activity were closely tied to SBH.  For instance, certain Biscayne Capital clients were offered opportunities individually to invest in SBH's real estate projects.  Over time, this practice morphed.  The Principals began to attract capital for SBH by forming offshore entities to issue notes (the "***Notes***") to investors (the "***Noteholders***").  In 2006, they formed Sentinel Investment as a Cayman Islands "segregated portfolio company."  Sentinel Investment is one of the Note Issuers and was the first Note Issuer to issue Notes.  The Liquidators believe that the Notes were marketed predominantly or exclusively to Biscayne Capital clients.

15.    This use of offshore vehicles to raise capital accelerated over time.  Between 2010 and 2013, four additional Note Issuers were formed – Diversified Real Estate, Preferred Income, SG Strategic, and GMS Global.  SGG (or predecessors and/or individuals associated with SGG) were appointed as directors for each of these four Note Issuers, each of which issued Notes to Biscayne Capital clients.

16.    The Notes were sold through the issuance of private placement memoranda (the "***PPMs***") that discussed the Note Issuers, their investment activities, and risks associated with investing in Notes issued by the Note Issuers.  While the description of the investment changed over time, generally the PPMs disclosed that the proceeds of the Notes would be used to fund investment in high-end South Florida real estate.  In certain instances, PPMs also disclosed that funds would be used to make equity investments into Biscayne Capital.

17.    The money raised from the issuance of Notes was, in fact, frequently (but not always) lent to SBH.  Some of the funds were used in connection with the South Florida real estate that SBH was attempting to develop.  However, in most (or all) instances, that real estate was also subject to prior mortgages that were in default or near default and those assets could not

realistically be liquidated to repay the Notes.  Similarly, SBH made substantial capital contributions to Biscayne Capital, subsidizing its losses, including losses that arose from making payments to attract new brokers (and their clients' money) to Biscayne Capital.  The new brokers (with their new clients) provided new parties to whom Notes could be sold.

18.    Using proceeds from the Notes to fund consistent loss-making ventures like SBH's real estate activity and Biscayne Capital created a problem.  As the Notes began to mature, the assets owned by SBH could not be liquidated to repay the maturing Notes.  Thus, the Principals were forced to decide: allow SBH (and also the Note Issuers) to collapse because they did not have the realizable asset value to repay the Notes at maturity or turn to alternative means to continue to prop up the enterprise.  The Principals chose the latter course.  This included issuing new Notes to repay maturing Notes, as well as engaging in elaborate mechanisms to "roll" one set of maturing Notes into new Notes with longer-dated maturities.  And in still other cases, it involved simply trying to extend the maturity of the Notes.

19.    In addition to making investments in loss-making enterprises such as SBH and Biscayne Capital and otherwise operating a Ponzi scheme to stave off collapse of the enterprise, in many instances, the Principals simply stole money.  In some instances, this theft was orchestrated through "loans" to entities affiliated with Principals that were never repaid.[8]  In other instances, the theft was accomplished through personal expenses advanced by the companies that were never repaid.

---

[8] For instance, the Liquidators' action against Inmobilaria del Norte Inorsa, LLC ("**_INORSA_**") – brought in this Court – is one such example of theft.  INORSA was owned and controlled by Mr. Weisson.  It caused SG Strategic, directly or indirectly, to loan it more than $11 million and, to date, has repaid a _de minimis_ amount of the alleged loan – approximately $12,000 in the seven years that the "loan" has been outstanding.  This Court entered summary judgment against INORSA and the Liquidators are now in the process of trying to collect on this judgment.

**B.  The SEC Investigation, the Reorganization, and the Consent Order.**

20.     The Biscayne Capital Scheme attracted the attention of the United States

Securities and Exchange Commission (the "**SEC**") at a relatively early stage.  No later than

March 2012, the SEC had commenced an investigation (the "**SEC Investigation**") of Biscayne

Capital International, LLC ("**BCI**"), at that time a U.S. registered investment advisor, as well as

certain of the Principals.  That investigation focused on BCI's and the Principals' failure to

disclose multiple conflicts of interest in connection with the recommendation and sale of the

Notes.

21.     The SEC Investigation represented a substantial threat to the Biscayne Capital

Scheme.  The Principals engaged in at least two "reorganizations" that the Liquidators believe

were intended to try to distance the Note Issuers and Biscayne Capital from the regulatory

oversight of the SEC.  The first, which closed in 2012, effectively re-domesticated the holding

company from Delaware to Bermuda.  The current holding company, Biscayne Capital Holdings,

Ltd., is one of the Chapter 15 Debtors.  From before he joined SGG until his resignation on July

3, 2018, Mr. Oosten, acted as a director of Biscayne Capital Holdings, Ltd.  The second

reorganization, which closed in 2016, created two British Virgin Islands trusts – the SBH Trust

and the Vanguardia Trust (together, the "**Trusts**")[9] – to hold the ownership interests in each of

the Note Issuers as well as the entities that formerly held the real estate assets that supposedly

were the collateral supporting the Notes.  A third party, Amicorp, agreed to act as the trustee of

the Trusts.  Mr. Oosten served as the protector of the Trusts.

---

[9] In 2017, the Principals created yet a third trust – the Diversified Asset Trust.  While this trust was formally created, the Liquidators have not identified any material assets or liabilities that were transferred to it.  The Settlement Agreement defines the term "Trusts" to include each of the SBH Trust, the Vanguardia Trust, and the Diversified Asset Trust.  Because the Diversified Asset Trust is believed to hold no assets and no liabilities, the Liquidators do not make any substantial mention of it in this Settlement Motion.

22.     The Trusts were formed as British Virgin Islands "VISTA" trusts.  By opting for VISTA trusts, the Principals, who are the "settlors" of the Trusts, were able to continue to exercise substantial influence over the Trusts' assets, including the Note Issuers, both as settlors of the Trusts and through a series of consulting arrangements that they established.  Based upon the Liquidators' investigation, these reorganizations did not serve any legitimate business purpose, but, instead, were part of the Biscayne Capital Scheme. The reorganizations were intended to obscure the Principals' continued involvement with the Note Issuers and other related entities, while still allowing the Principals to remain in control and escape the regulatory oversight of the SEC.

23.     The SEC Investigation culminated on May 27, 2016, in entry of an *Order Instituting Administrative Cease-and-Desist Proceedings, Pursuant to Section 203(e), 203(f), and 203(k) of the Investment Advisors Act of 1940, and Section 9(b) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order* (the "**SEC Order**").  A true and correct copy of the SEC Order is attached hereto as **Exhibit D**. The respondents in the SEC Investigation and SEC Order were BCI, Roberto Cortes, Ernesto Weisson, Juan Carlos Cortes, and Frank Chatburn.  Roberto Cortes is under indictment, and Messrs. Weisson and Chatburn have pled guilty to certain criminal acts.  SGG was not named (or otherwise identified) in the SEC Order.

24.     The SEC Order described the basic framework of the Biscayne Capital Scheme. The Principals failed to disclose that they held a beneficial interest in both the Note Issuers, which issued the Notes that were purportedly backed by "non-registered" mortgages, and SBH, which was the beneficiary of the proceeds from the sale of the Notes.  *See* SEC Order ¶ 19.  The Principals also owned Biscayne Capital, with the majority being owned through SBH.  *Id*. ¶ 21.

SBH made millions of dollars of capital contributions to Biscayne Capital, but SBH did not generate sufficient revenue or operating cash flow to pay off its maturing debts.  *Id*. ¶¶ 22, 26-29. To make up these shortfalls, the Principals looted the Note Issuers to fund the continued losses of SBH.  *Id*. ¶ 31.  The SEC Order censured BCI and barred certain Principals from associating with regulated financial entities.

### C. Other Actors and Entities Used to Hide and Extend the Scheme: Additional Note Issuances through IA Capital, Madison Asset, LLC, Additional Trusts, and Other Entities.

25.     Given the pendency of the SEC Investigation, the Principals' practical ability to continue to use the Note Issuers to further their Ponzi scheme was limited.  However, to try to prop up the Biscayne Capital Scheme, the Principals looked overseas and turned to other means to steal money.  For instance, starting in 2015, they issued notes that were purportedly ultimately backed by an investment in the equity of Biscayne Capital Holdings, Ltd. through IA Capital Structures (Ireland) PLC ("*IA Capital*").  The Liquidators believe that the Principals succeeded in causing IA Capital to issue tens of millions of dollars of additional notes (the "*IA Capital Notes*") purportedly backed by assets related to the Biscayne Capital Scheme (and, indeed, many of the claimants in the *Lopez* Lawsuit claim to be holders of IA Capital Notes, not Notes issued by the Note Issuers).  IA Capital was an entirely separate structure from the Note Issuers and the Liquidators do not currently control any of the entities that issued IA Capital Notes, despite the fact that the IA Capital Notes were connected to the broader Biscayne Capital Scheme.  None of the entities that issued the IA Capital Notes are debtors in these proceedings.  Based upon the

Liquidators' investigation to date, there is no evidence that SGG was involved with IA Capital or the IA Capital Notes.[10]

26.     In addition to being responsible for the issuance of the IA Capital Notes, the Principals created a number of other companies to continue the Biscayne Capital Scheme overseas and obscure it from the oversight of regulators, investors, and others.  These include an entity known as Madison Asset, LLC ("***Madison***"), a Cayman Islands entity incorporated in 2014.  Madison was established by Principals of the Biscayne Capital Scheme and, among other things, was given control over the Note Issuers' bank accounts without proper documentation or authorization by SGG.   Madison looted these accounts.  Like the IA Capital Notes, many of the *Lopez* Claimants claim to be creditors of Madison. And, as with the IA Capital Notes, SGG was unaffiliated with Madison.

27.     The Principals also created at least one additional trust – the Diversified Asset Trust – as well as a litany of other consulting entities through which they attempted to maintain control over the Biscayne Capital Scheme.  Based on the Liquidators' investigation, they do not believe that any substantial assets or liabilities were ever placed into the Diversified Asset Trust. Additionally, for purposes of this Settlement Motion, the other consulting entities are not directly relevant to the relief sought herein.

**D.  The Scheme Collapses, SGG Resigns, and the Liquidations Commence.**

28.     By early 2018, the Principals were unable to continue to raise new funds to pay maturing debts and unable to continue to fund the losses being incurred by Biscayne Capital. The Biscayne Capital Scheme, in short, had collapsed.  In July 2018, SGG (including Mr.

---

[10] As described further below, this is a significant fact the Court should consider.  Investors that hold IA Capital Notes were essentially "strangers" to SGG.  However, the investors in the *Lopez* Lawsuit ignore this distinction and are pursuing SGG (as well as others), an entity unconnected to the IA Capital Notes.

Oosten) and Josephus Horsten (another SGG employee) resigned from their positions with the Note Issuers, the Trusts, and Biscayne Capital Holdings, Ltd.  Each of the Chapter 15 Debtors was placed into liquidation proceedings in the jurisdiction of its organization (collectively, these are the "*Liquidations*"), and shortly thereafter these Chapter 15 Cases were commenced.

29.    From the commencement of the Liquidations, it was clear that any recovery for Noteholders would be speculative.  At the first meeting of creditors of the Note Issuers (held in Miami in December 2018), the Liquidators announced that none of the Note Issuers held any substantial assets with which to repay Noteholders and that the recovery for all Noteholders would be dependent upon identifying the wrongdoers who were responsible and holding them to account.

**E.  The *Romay* and *Lopez* Claimants Commence the Florida Lawsuits.**

30.    On October 16, 2018, certain Noteholders—led principally by Diego Romay (collectively, the "*Romay Claimants*")—filed the *Romay* Lawsuit in Miami-Dade County Circuit Court against several defendants, including SGG, certain Principals, and the Principals' affiliated entities.  A true and correct copy of the *Romay* Second Amended Complaint is attached hereto as **Exhibit E** (the "*Romay SAC*").

31.    The *Romay* Claimants allege that they had a complicated relationship with certain of the Principals, in particular Mr. Haberer, who is the brother of one of the *Romay* Claimants' sons-in-law.  *See Romay* SAC ¶ 11.  Mr. Haberer is one of the Principals that is currently under indictment.  The *Romay* Claimants allege that Mr. Haberer used his close position with the *Romay* Claimants to gain control over certain investment accounts controlled by trusts that they owned.  *See id.*  He allegedly used this control to "loot" the investment accounts and he "caused [the investment accounts] to invest in the Notes. . .."  *Id.* ¶ 23; *see also id.* ¶ 88 ("Haberer was swapping out legitimate assets in the accounts for the worthless Notes, so as to loot the value of

the assets that had existed in the accounts."). The *Romay* Claimants are clear that, but for the investment into the Notes, their investment structure "would have worked." *Id*. ¶ 10 ("Had [the] defendants, acting in concert and with others, not siphoned funds out of good investments and into a Ponzi scheme [*i.e.*, by purchasing Notes], the trust structure would have worked as devised and as represented."). In other words, the damages that the *Romay* Claimants assert in the *Romay* Lawsuit are damages that arise from losses on the Notes and the inability of the Note Issuers to repay the Notes.

32.    While SGG is mentioned throughout the *Romay* SAC, the actual allegations against SGG are as notable for what they omit as for what they assert. They focus on SGG's alleged involvement with the Note Issuers or with the Trusts. They do *not* assert that SGG had direct involvement with the *Romay* Claimants. It is the injury that SGG was alleged to have caused directly or indirectly to the Note Issuers that forms the basis of the claims against SGG in the *Romay* SAC. Thus, for instance, the *Romay* Claimants assert that "SGG BVI gave Roberto Cortes a power of attorney to sell Florida real estate held within the SBH trust, resulting in the looting of limited trust assets." *Id*. ¶ 37. Similarly, the *Romay* Claimants focus on SGG's role *within* the Biscayne Capital Scheme, not any relationship (or duty) that SGG allegedly owed to the *Romay* Claimants individually. *See, e.g., id.* ¶¶ 72-73 ("the [SBH and Vanguardia Trust] structures were created with the crucial assistance of … SGG Curaçao, and SGG BVI…"), ("SGG Curaçao and SGG BVI also provided a range of services to the SBH and Vanguardia trusts."). Indeed, the factual allegations in the *Romay* SAC that relate to SGG's alleged conduct specifically – contained at paragraphs 249 through 266 of the *Romay* SAC – focus exclusively on SGG's involvement with the Note Issuers, the Trusts, and the Principals, and not the *Romay*

Claimants individually.  There is no allegation in these factual assertions that SGG ever interacted directly with any of the *Romay* Claimants.  *See id.* ¶¶ 249-66.

33.    The counts in the *Romay* SAC that implicate SGG are consistent with the factual allegations.  Each of the counts – to the extent that they reference SGG at all – focuses on SGG's conduct within the Biscayne Capital Scheme and the harm that the *Romay* Claimants allege that SGG did to the Note Issuers (which harmed all Noteholders collectively), rather than focusing on any specific representation or conduct SGG allegedly directed at the *Romay* Claimants specifically.  The counts where SGG is named are Counts VII (conspiracy to defraud – against all defendants), IX (aiding and abetting fraud – against SGG only), XIII (conspiracy to commit conversion – against all defendants), and XV (aiding and abetting conversion – against SGG only).

34.    Count VII asserts a conspiracy to defraud against all defendants.  The *Romay* Claimants state that the "objective" of the asserted conspiracy was "to cause the worthless Notes to be sold to the accounts of unsuspecting investors . . .."  *See id.* ¶ 332.  The only allegation in Count VII that specifically references SGG focuses on its alleged conduct in the Biscayne Capital Scheme and makes no reference to any action SGG was alleged to have taken specifically directed at any of the *Romay* Claimants.  *See id.* ¶ 333(d).

35.    Count IX, a count for aiding and abetting fraud, is directed against SGG individually.  Similar to Count VII, the *Romay* SAC asserts the elements of the claim under Florida law (*i.e.*, knowledge and substantial assistance), but none of these actions were allegedly directed towards the *Romay* Claimants themselves.  *See id.* ¶¶ 345-46.  Instead, the allegations are focused on actions (or omissions) related to SGG's involvement with the Note Issuers and

Principals.[11]  The same holds true for the other counts that implicate SGG – Counts XIII and XV.

They each only allege actions that SGG allegedly took *within* the Biscayne Capital Scheme.

There is no specific assertion of any individual act that SGG ever took individually towards any

of the *Romay* Claimants.  *See id.* ¶¶ 388-94, 401-06.

36.    The Complex Business Litigation Section of the Circuit Court for the Eleventh

Judicial Circuit dismissed the *Romay* SAC against SGG for lack of personal jurisdiction.  A true

and correct copy of the court's order is attached hereto as **Exhibit F**.  That order is currently

pending on appeal before Florida's Third District Court of Appeals.

37.    The other civil action that names SGG is the *Lopez* Lawsuit, which was filed on

February 21, 2020 by 162 plaintiffs against SGG, as well as a number of other defendants.  A

true and correct copy of the First Amended Complaint (the "***Lopez FAC***") is attached hereto as

**Exhibit G**.[12]

38.    The *Lopez* FAC is similar to the *Romay* SAC in its broad description of the

Biscayne Capital Scheme.  As with the *Romay* SAC, it makes no specific allegations of any

conduct that SGG directed towards any of the *Lopez* Claimants, instead asserting generalized

allegations against SGG for its alleged involvement in the Biscayne Capital Scheme.  The

Liquidators will not repeat the allegations in the 361 paragraph *Lopez* FAC related to the

Biscayne Capital Scheme or SGG's alleged involvement in it here, but the *Lopez* FAC's

description of the Biscayne Capital Scheme is consistent with the description contained in the

---

[11] The Liquidators' description of the allegations in the *Romay* SAC are solely intended to analyze those allegations for the benefit of the Court.  The Liquidators do not adopt the framing of any of the allegations therein as their own.

[12] On July 17, 2020, the plaintiffs in the *Lopez* Claimants filed a Motion For Leave to Amend Complaint and Add Parties, attaching a copy of the *Lopez* FAC.  On July 22, 2020, the court granted the *Lopez* Claimants' motion and deemed the *Lopez* FAC filed as of July 21, 2020.  Although the *Lopez* Claimants served the *Lopez* FAC on the defendants therein, the only copy of the *Lopez* FAC on the court docket is attached to the Motion for Leave to Amend Complaint and Add Parties.

*Romay* SAC, insofar as it is relevant to this Settlement Motion.  Specifically, the *Lopez* FAC's allegations directed at SGG relate to SGG's relationship with the other named defendants and do not identify direct contact SGG was alleged to have had with the *Lopez* Claimants.

39.    While similar to the *Romay* SAC, there are several notable distinctions.  First, the *Lopez* FAC contains counts seeking relief against SGG that are indisputably property of the liquidation estates of the Note Issuers, which the Liquidators on behalf of the Note Issuers have the exclusive authority to settle for the benefit of all Noteholders.  Counts XVI, XVIII, XX, and XXII each assert alleged claims against SGG for breach of fiduciary duty arising out of SGG's service as a director of each of the Note Issuers.  *See Lopez* FAC ¶¶ 226-230, 236-240, 246-250, and 256-260.  While the *Lopez* FAC attempts to claim that these duties are somehow owed directly to the Noteholders, this is incorrect.  Under Cayman Islands law, SGG was a fiduciary for the Note Issuers alone, and any claim for breach of those fiduciary duties belongs exclusively to the Note Issuers to be brought on their behalf by the Liquidators.  *See, e.g., In re CIL Ltd.*, 2018 Bankr. LEXIS 354, at *27-28 (Bankr. S.D.N.Y. Feb. 9, 2018) (explaining that "[u]nder Cayman Islands law, directors only owe fiduciary duties to the company for which they serve, not to its investors or shareholders"); *Q China Holdings, Ltd. v TZG Capital Ltd.*, 2018 N.Y. Misc. LEXIS 1554, at *10 (N.Y. Sup. Ct. Apr. 23, 2018) ("QCH has not stated a direct claim for breach of fiduciary duty against Tsen.  Directors of a Cayman Islands company owe fiduciary duties to the company, but not to its shareholders."); *Wimbledon Fin. Master Fund, Ltd. v Weston Capital Mgt. LLC,* 2017 N.Y. Misc. LEXIS 2725, at *49-50 (N.Y. Sup. Ct. July 17, 2017) ("Nonetheless, the breach of fiduciary duty claim asserted against de Waal and Bos is dismissed.  Since de Waal's and

Bos' only role was serving on Gerova's board, under Cayman Islands law, they . . . only had fiduciary duties to the company [], not its investors.").[13]

40.    Second, on its face, the *Lopez* FAC seeks a judgment on behalf of many *Lopez* Claimants that are unrelated to the Note Issuers, against SGG, among others.  Exhibit B to the *Lopez* FAC details each of the *Lopez* Claimants, the entity into which each allegedly invested, and the amount of their alleged investment.  As set forth therein, *most* of the *Lopez* Claimants assert that they invested in entities *other than* the Note Issuers, such as Madison or in IA Capital Notes.  *See Lopez* FAC, Exhibit B.  There is no allegation in the *Lopez* FAC that SGG played any direct role with respect to either Madison or the IA Capital Notes, and the Liquidators' investigation to date has revealed none.

41.    These claimants are not insubstantial either.  Of the 162 *Lopez* Claimants, approximately one-third assert losses arising from investments other than in Notes (primarily in IA Capital Notes).  Indeed, only approximately 40% of the *Lopez* Claimants assert that their losses arise exclusively from investments in Notes.[14]

42.    The *Lopez* Claimants assert total damages arising from investments in Notes of approximately $32.54 million (out of $74.11 million in total alleged damages, approximately 43% of the total).  The other damages asserted by the *Lopez* Claimants totaling approximately $41.67 million are related to investments that were not in Notes.  *In other words, if the Lopez Claimants succeed in their action against SGG approximately 57% of any recovery from SGG*

---

[13] The Liquidators reserve any and all rights against the Lopez Claimants (and their counsel) arising from or related to these plaintiffs' efforts to pursue causes of action that the Liquidators alone are authorized to pursue.  *See* 11 U.S.C. §§ 1520(a)(1), 1521(a)(1), (5).

[14] The remaining *Lopez* Claimants assert losses from investments in both Note and non-Note products, such as IA Capital Notes.  The presentation in Exhibit B to the *Lopez* FAC and the captioning of the *Lopez* Claimants contain inconsistencies that make precise calculations difficult.  For instance, in the caption, certain *Lopez* Claimants are listed as separate plaintiffs; however, these separate plaintiffs are included on a single line item in Exhibit B to the *Lopez* FAC.

*would appear to go to Lopez Claimants that had no relationship with the Note Issuers with which SGG was involved.*

43.     The converse is also true: there are limited assets and limited targets that can be pursued to recover money for the Note Issuers to benefit the Noteholders.  Allowing such a large group of *Lopez* Claimants (those who did not invest in Notes) to pursue SGG (which was only involved through the Note Issuers), would result in an improper windfall and inequitably diminish the available assets to repay the Note Issuers (and therefore fund a recovery to the Noteholders).

44.     And third, there is a very notable *omission* from the *Lopez* FAC.  As detailed in the description of the *Romay* SAC above, Fernando Haberer – one of the Principals who is under criminal indictment – was deeply, intimately and materially involved in stealing money from victims of the Biscayne Capital Scheme, including the *Lopez* Claimants, and enriching himself.[15] Despite his central role in victimizing the *Lopez* Claimants, he is not named as a defendant in the *Lopez* FAC.  *Indeed, in the entire 361 paragraph Lopez FAC, Mr. Haberer's name is never even mentioned*.

45.     This is more than an idle curiosity.  The Liquidators have reason to believe that Mr. Haberer, and those working with him facilitated the filing of the *Lopez* FAC to deflect attention from his own critical role in orchestrating and facilitating the Biscayne Capital Scheme. The attorneys representing the *Lopez* Claimants appear to be preparing to oppose this Settlement

---

[15] In the indictment against him, Mr. Haberer's activities are described as follows:  "With full knowledge that Biscayne Capital was about to collapse, the defendants [Cortes, Haberer, and Weisson], together with others used the funds they misappropriated and fraudulently obtained from Biscayne Capital clients … to perpetuate and conceal the fraudulent scheme by, among other things, (a) making interest and principal payments owed to other Biscayne Capital clients and (b) making payments to individuals affiliated with Biscayne Capital, including owners, employees, and financial advisors.  *See* Case No. 21-cr-458-CBA (E.D.N.Y.), Docket No. 1, ¶ 15.  In addition to stealing their money, Mr. Haberer allegedly personally profited from this theft.  *See id.* ¶ 16 ("the defendants, [Cortes, Haberer, and Weisson] paid themselves millions of dollars from funds that their clients had invested with Biscayne Capital.").

Motion.[16]  Should they do so, the extent of Mr. Haberer's involvement in facilitating the *Lopez* Lawsuit may be relevant to this Court's assessment of any objection the *Lopez* Claimants might file.  Mr. Haberer has incentives that are very much opposed to maximizing the value of recovery by the Note Issuers for the benefit of Noteholders.

46.     Currently, as against SGG, the *Lopez* Lawsuit has been stayed.  SGG has filed a motion to dismiss based on lack of personal jurisdiction materially similar to the one that the same trial court granted in the *Romay* Lawsuit.  Rather than enter an order that would create a second appeal on essentially the same personal-jurisdiction issue, the Eleventh Judicial Circuit Court stayed that action pending resolution of the appeal of the dismissal of the *Romay* SAC.  A true and correct copy of the order staying the *Lopez* Lawsuit is attached hereto as **<u>Exhibit H</u>**.

**F.  The Note Issuers Are Placed into Liquidation, the Liquidators Commence Their Investigation, and Claimants File Proofs of Debt in the Liquidation Proceedings.**

47.     Each of the Note Issuers is organized under the laws of the Cayman Islands. After SGG's resignation, the Liquidators were appointed and the Liquidation of each of the Note Issuers (among others) was brought under the supervision of the Cayman Court.  Further details regarding the commencement of the Liquidations are set forth in the *Declaration of Michael Pearson in Support of Petition for Order Recognizing Foreign Main Proceeding and Granting Additional Relief.  See* Docket No. 4.  This Court entered an order recognizing each of the Liquidations as "foreign main proceedings" on January 14, 2019 (the "***Recognition Order***").  *See* Docket No. 22.  By operation of the entry of the Recognition Order, section 362 of the Bankruptcy Code became applicable with respect to each of the Chapter 15 Debtors and their property within the territorial jurisdiction of the United States. S*ee* 11 U.S.C. § 1520(a)(1).

---

[16] *See* Docket No. 122.

48.     Since the Court entered the Recognition Order, the Liquidators have conducted (and are conducting) a substantial investigation into the circumstances surrounding the commencement of the Liquidations, specifically the facts surrounding the Biscayne Capital Scheme and parties that are potentially culpable in relation to it.  To date, the Liquidators have served approximately 100 subpoenas, collected approximately 8,000,000 documents, , and held hundreds of hours of voluntary interviews with cooperating parties.  The Liquidators also have commenced four civil actions in the United States against a total of 100 different defendants and have otherwise entered into tolling agreements and settlement discussions with a number of other parties.  Because there are no physical assets of the Note Issuers, any recovery for Noteholders and other creditors will only come as a result of litigation judgments and settlements.

49.     In the Liquidations, an ad hoc committee of creditors (the "***Ad Hoc Committee***") has been formed to consult and communicate with the Liquidators.  The Liquidators communicate all major developments in the Liquidations with the Ad Hoc Committee and seek its input and consultation on major decisions impacting the Liquidations, including the proposed Settlement Agreement.  The Ad Hoc Committee supports the Liquidators' entry into and performance under the Settlement Agreement.

50.     As the primary vehicle for the liquidation of the Chapter 15 Debtors, creditors principally file proofs of debt with the Liquidators to assert their claims and obtain a recovery. As of the filing of this Settlement Motion, 213 creditors of the Note Issuers and/or their affiliates in liquidation have filed proofs of debt claiming losses of $199,904,971.89.  This includes the *Romay* Claimants who filed proofs of debt related to the Notes they hold as a result of the allegations contained in the *Romay* SAC.  Forty-one *Lopez* Claimants have filed sixty proofs of debt against the Note Issuers asserting total claims of $10,426,781.21.

**G. The Liquidators Investigate SGG and the Parties Agree to Toll and Mediate.**

51.     SGG has been a primary target of the Liquidators' investigation since the commencement of the Liquidations, given the important roles SGG played as director of each of the Note Issuers.  In September 2020, the Liquidators entered into a tolling agreement with SGG.

52.     During their investigation, it became clear to the Liquidators that it would be appropriate to attempt to mediate their disputes with SGG and that a mediation would most likely succeed it if was directed by an experienced mediator.  In May 2021, the Liquidator and SGG agreed to mediate.  Shortly thereafter, the Liquidators proposed, and SGG agreed, to engage Antonio Piazza, a leading mediator who is known for his ability to resolve complex high-stakes, and high-profile disputes.

53.     In furtherance of settlement discussions, the Liquidators identified causes of action they were prepared to assert against SGG in litigation.  Among other things, the Liquidators concluded that SGG owed fiduciary duties to each of the Note Issuers, that it failed to discharge those duties, and that the Note Issuers were damaged as a result of those failures.

54.     After considering the Liquidators' position, SGG responded by identifying certain potential defenses that, if established, might negate or substantially mitigate SGG's liability.

55.     The Parties conducted an initial mediation session in September 2021.  That session resulted in the tentative outlines of a potential negotiated resolution.  However, as the Parties sought to document a settlement agreement, it became clear that material issues remained unresolved.  By late December 2021, the Liquidators decided not to continue with negotiations and, in early February 2022, gave notice of termination of the applicable tolling agreement.

56.     After these events, the Liquidators received a request from Mr. Piazza to resume the mediation to resolve the issues.  The Liquidators consented, and the Parties worked in good faith to resolve the issues and come to an acceptable form of settlement agreement.  These efforts

culminated in a further mediation session on April 12, 2022, when the Parties agreed to enter into the Settlement Agreement that is currently before the Court in this Settlement Motion.

### H. Summary of the Settlement Agreement.[17]

57.     The Settlement Agreement settles all disputes among the Liquidators and SGG related to the Biscayne Capital Scheme.  The material terms of the Settlement Agreement are as follows:

    a.   SGG will make two settlement payments totaling $22.5 million, and delineated as follows:

        i.   A $17.5 million settlement payment (the "***Initial Settlement Payment***") by SGG to the Liquidators (on behalf of the Note Issuers) within thirty calendar days of entry of orders by this Court approving (1) the Settlement Motion and Bar Order, and (2) the Stay Motion,[18] provided that such orders are not subject to re-argument, re-consideration, or re-hearing (such orders, respectively, the "***Chapter 15 Approval Order***" and the "***Chapter 15 Stay Order***"); and

        ii.   A $5 million settlement payment into an escrow account (the "***Escrowed Settlement Payment***" and together with the Initial Settlement Payment, the "***Settlement Amount***") on the date the Initial Settlement Payment is made. The Escrowed Settlement Payment, net of all duly authorized amounts

---

[17] Any description of the terms of the Settlement Agreement is for summary purposes only. A true and correct copy of the Settlement Agreement is attached to this Settlement Motion as **Exhibit B**.  If there is any inconsistency between the terms of the Settlement Agreement and the summary provided herein, the Liquidators intend for the terms of the Settlement Agreement to control.

[18] The "***Stay Motion***" is the *Motion of the Joint Official Liquidators (in Their Capacity as  Foreign Representatives) for an Order Pursuant to 11 U.S.C. §§ 1521 and 1507 (A) Staying Certain Pending Litigation and (B) Granting Related Relief*, which the Liquidators are filing contemporaneously with this Settlement Motion.

properly reimbursable to SGG as set forth in the Settlement Agreement, shall be paid to the Liquidators provided that (a) enforcement of the Cayman Approval Order has not been stayed, (b) the Chapter 15 Approval Order has become a "final order," and (c) the statute of limitations for certain claims (as further set forth in the Settlement Agreement) shall have run.  If those conditions are not satisfied within ten years of the Settlement Agreement Effective Date, or if those conditions cannot be satisfied because the Chapter 15 Approval Order has not become a final order, then the Escrowed Settlement Payment shall be paid to IQ-EQ Parent.

b.  In exchange for payment of the Settlement Amount, the "Releasing Parties" will release the "Released Parties" for all "Released Claims."  The chart immediately below summarizes the scope of each of these terms under the Settlement Agreement.[19]

| Released Parties | Saphilux S.à.r.l., SGG Management (BVI) Ltd., SGG Management (Curaçao) N.V., Herman Oosten, and Josephus Horsten and each of their Related Parties.  *See* Settlement Agreement §§ 1(xxix), Schedule B of Exhibit 2. |
|---|---|
| Releasing Parties | The Note Issuers, the Liquidators, in their capacities as authorized representatives of the Note Issuers, their beneficiaries, predecessors, subsidiaries, affiliates, successors, assignees, and transferees, and to the extent each of the following was or is acting on behalf of the Liquidators or the Note Issuers, current or former agents, creditors, shareholders, officers, principals, directors, executives, employees, and attorneys of each of the Liquidators and the Note Issuers. *See* Settlement Agreement §§ 1(xxx). |

---

[19] The charts contained in this Settlement Motion are summaries only and do not contain the complete language set forth in the Settlement Agreement.  Cross-references to the relevant provisions of the Settlement Agreement are contained in the charts and the reader should reference the Settlement Agreement for a complete statement of the scope of the provisions that are summarized herein.

| Released Claims | "Causes of Action"[20] arising out of or relating to any transactions, acts, or omissions by the Released Parties (or a Protected Person) in connection with the Note Issuers, the Notes, and/or the Biscayne Capital Scheme, including, without limitation, (a) the Liquidators' Claims, and (b) any Causes of Action that the Liquidators may hold on behalf of the Note Issuers against any Released Parties or Protected Persons arising from or related to the Trusts, including, without limitation, the establishment, structuring, operations, oversight of, or disposition of assets of the Trusts.  Causes of Action asserted or that may be asserted against SGG in the Florida Lawsuits that (a) may as a matter of law be asserted by, on behalf of, or for the benefit of the Liquidators on behalf of the Note Issuers, the Note Issuers' estates, or the Note Issuers' creditors, (b) are property of the Note Issuers within the territorial jurisdiction of the United States (within the meaning of section 1520(a)(1) of the Bankruptcy Code), or (c) are otherwise derivative of claims of the Liquidators, the Note Issuers, or the Note Issuers' estates, are included within the definition of Released Claims. *See* Settlement Agreement §§ 1(xxviii). |
|---|---|

c.  In addition to the releases granted under the Settlement Agreement, the effectiveness of the Settlement Agreement is also conditioned upon entry of the Bar Order.  The Bar Order will bar "Barred Persons" from pursuing "Barred Claims" against "Protected Persons."  The chart immediately below summarizes the scope of each of these terms under the Settlement Agreement.

| Protected Person[21] | Saphilux S.à.r.l., SGG Management (BVI) Ltd., SGG Management (Curaçao) N.V., Herman Oosten, and Josephus Horsten and each of their Related Parties.  *See* Settlement Agreement §§ 1(xxvi), Schedule B of Exhibit 2. |
|---|---|
| Barred Persons | (a) The "Companies," (b) the "Trusts," (c) the Liquidators, (d) all holders of "Barred Claims," including (i) all Noteholders; (ii) anyone who may be liable in connection with the Biscayne Capital Scheme; and (iii) all co-defendants in the Florida |

---

[20] The term "***Causes of Action***" is defined in Section 1(v) of the Settlement Agreement and, as set forth therein, provides a broad and general definition of such term.
[21] The scope of the definition of "Protected Person" is the same as the scope of the definition of "Released Person."

|  | Lawsuits or other third-parties who assert Claims for contribution, indemnity, or reimbursement arising out of or related to any Cause of Action; and (e) to the extent not otherwise barred, the following: (i) any person that has filed a proof of debt in the Cayman Proceedings; (ii) any litigant in the Florida Lawsuits; and (iii) any litigant in the claims that the Liquidators have brought against Deutsche Bank (*Pearson, et al. v. Deutsche Bank AG, et al.*, Case No 1:21-cv-22437-BB (S.D. Fla. 2021)). *See* Settlement Agreement §§ 1(iv). |
| --- | --- |
| **Barred Claims** | (a) Causes of Action that (i) could be asserted, pursued, settled, or compromised by the Liquidators or that seek redress for a loss suffered by, or harm done to, the Note Issuers, and (ii) could be brought in any United States federal or state court against one or more Protected Persons arising from or relating to the conduct of any SGG Party or its Related Parties that relates to the Biscayne Capital Scheme; and (b) any Claim for contribution, indemnity, or reimbursement against one or more Protected Persons arising out of or related to any Cause of Action that arises from or relates to the Biscayne Capital Scheme. "Barred Claims" includes all claims in the Florida Lawsuits against any Protected Party. *See* Settlement Agreement §§ 1(iii). |

## PREDICATES FOR THE RELIEF REQUESTED

58.     This Court has authority under 11 U.S.C. §§ 105 and 1521, 28 U.S.C. § 1651 (*i.e.*, the All Writs Act) and Bankruptcy Rule 9019(a) to grant this Settlement Motion, approve the Settlement Agreement, and enter the Bar Order substantially in the form of the Proposed Order attached hereto as **Exhibit A**.

## ANALYSIS AND CITATION TO AUTHORITY

### A.  The Settlement Agreement Should Be Approved under Bankruptcy Rule 9019.

59.     Bankruptcy Rule 9019(a), entitled "Compromise and Settlement," provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Bankruptcy Rule 9019 further provides that "[n]otice shall be given to creditors,

26

the United States trustee, the debtor, and indenture trustees as provided in [Bankruptcy] Rule

2002 and to any other entity as the court may direct."

60.     The decision to approve a settlement or compromise lies within the discretion of

the Court and is warranted when the settlement is found to be adequate, reasonable, and fair

considering the particular circumstances of the case.  *See Chira v. Seal* (*In re Chira*), 567 F.3d

1307, 1312-13 (11th Cir. 2009); *In re Air Safety Intern., L.C.*, 336 B.R. 843, 852 (S.D. Fla.

2005); *In re Morgan*, 2011 WL 13185742, at *4 (S.D. Fla. Feb. 14, 2011); ("It has long been the

law that approval of a settlement in a bankruptcy proceeding is within the sound discretion of the

Court, and will not be disturbed or modified on appeal unless approval or disapproval is an abuse

of discretion.") (quoting *In re Arrow Air, Inc.*, 85 B.R. 886, 890-891 (Bankr. S.D. Fla. 1988)).

61.     In ruling on proposed settlements, "the Court must make an informed,

independent judgment that the compromise is fair and equitable."  *In re First NLC Fin. Servs.,*

*LLC*, 2009 Bankr. LEXIS 1083, at *13-14 (Bankr. S.D. Fla. Mar. 12, 2009).  However, "a trial or

'mini-trial' on the merits is not required for court approval of a settlement."  *Id*.  Instead, "the

court's responsibility is to canvass the issues and see whether the settlement 'falls below the

lowest point in the range of reasonableness.'"  *Id.* (citing *Official Comm. of Unsecured Creditors*

*of Int'l Dist. Ctrs., Inc. v. James Talcott, Inc. (In re. Int'l Dist. Ctrs., Inc.)*, 103 B.R. 420, 423

(S.D.N.Y. 1989) (quoting *In re W.T. Grant*, 699 F.2d 599, 608 (2d Cir. 1983)) ("We conclude by

reemphasizing that the task of the bankruptcy judge was not to determine whether the settlement

was the best that could have been obtained, something that neither he nor we can ever know, but

whether it 'fall[s] below the lowest point in the range of reasonableness'").  *Accord Wallis v.*

*Justice Oaks, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir.), (determining

that a bankruptcy judge does not have "to *decide* the merits of those claims" being resolved by a settlement, "only the *probability* of succeeding on those claims.") (emphasis in original).

62.    In determining whether to approve a settlement, courts in the Eleventh Circuit consider the following:

    (a)    the probability of success in litigation;

    (b)    the difficulty in collecting any judgment which may be obtained;

    (c)    the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attendant to it; and

    (d)    the paramount interest of creditors and a proper deference to their reasonable views of the settlement.

*In re Justice Oaks II, Ltd.*, 898 F.2d at 1549. Courts consider these factors to determine "the fairness, reasonableness[,] and adequacy of a proposed settlement agreement." *Gaddy's S.E. Prop. Holdings, LLC v. Gaddy Electric Plumbing, LLC* (*In re Gaddy*), 851 F. App'x 996, 1000 (11th Cir. 2021).

63.    In ruling on proposed settlements, a court may and should give weight to the opinion of the parties and their professional advisors that the factors outlined above have been explored and that the compromise is fair and reasonable. *See Int'l Distrib. Ctrs., Inc. v. , Inc.*, 103 B.R. at 420, 423 (recognizing that "[a] court may give weight to the Trustee's informed judgment that a compromise is fair and equitable and consider the competency and experience of counsel who support the compromise"). Indeed, "[r]ecognizing the inherent uncertainty of complex litigation, a settlement's proponents must only establish that, 'all things considered, it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly it might be considerably less (or more) than were the case fought to the bitter end.'" *Francisco v. Numismatic Guar. Corp.*, 2008 WL 649124, at *8 (S.D. Fla. 2008) (quoting *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 564, 573 (5th Cir. 1960)); *see also United States v. Hartog*, 597

B.R. 673, 682 (S.D. Fla. 2019) ("In approving the settlement agreement, the Bankruptcy Court

… must only have made a pragmatic decision on the basis of all equitable factors [and]

[i]mportantly, [t]he decision of a [t]rustee in Bankruptcy to enter a settlement is made within his

or her business judgment.") (internal quotations omitted).

64.    The Settlement Agreement is fair and reasonable and the Court should approve it

based on applicable Eleventh Circuit precedent.  The first factor is the probability of success in

litigation.  While the Liquidators believe that they have meritorious claims, those claims have not

yet been presented to a court in a litigated context.  As set forth above, the losses suffered by the

Note Issuers were the result of an exceedingly complex and illegal scheme that operated over

many years and touched a multitude of jurisdictions.  *In re Litten*, 2007 WL 2020159, at *5

(Bankr. S.D. Fla. July 5, 2007) ("To that extent, any future litigation would be complex,

expensive and result in lengthy delays . . . with at best, an uncertain outcome . . . [and] the

creditors and the bankruptcy estate are best served through a quick and efficient resolution of the

pending claims.").  Many of the Principals are under indictment (or have pled guilty) to their

participation in the Biscayne Capital Scheme.  The Liquidators anticipate that, were this matter

to be fully litigated, SGG might seek to deflect liability based on the admitted illegal conduct of

the Principals.  Also, certain statute of limitations defenses may reduce the Liquidators'

recovery.  In addition, SGG is represented by competent counsel that – as has already been

shown in the Florida Lawsuits – would vigorously defend SGG in any litigation filed by the

Liquidators.  Thus, while the Liquidators believe that they are likely to succeed in litigation,

neither success in litigation nor, even if successful, recovery of a substantial quantum of damages

is assured.  Furthermore, the proposed Settlement Amount is substantial and, while it represents

a substantial discount to the amount of a judgment the Liquidators might be able to obtain, they

believe that it is warranted given that the settlement was reached when the potential litigation against SGG was at a very early stage, and it represents the Chapter 15 Debtors' largest recovery to date.  Therefore, this factor favors approval of the Settlement Agreement.

65.    The second factor is the difficulty of recovery on any judgment that might be obtained.  As part of their consideration of the terms of the Settlement Agreement, the Liquidators have considered the likely collectability of any judgment.  The only SGG entity that acted as a director for the Note Issuers was SGG BVI.  While that entity is part of a broader group of interrelated companies now operating under the brand "IQ/EQ," there is no assurance that the Liquidators could obtain a judgment against any of SGG BVI's affiliates.  Additionally, the Liquidators have obtained information concerning the availability of insurance for SGG BVI and have obtained professional advice regarding that insurance.  While SGG BVI is a named or additional insured on policies with a substantial aggregate limit, the quantum of payments contemplated under the Settlement Agreement represent a substantial portion of insurance that the Liquidators believe to be currently available to SGG BVI.  Furthermore, based on the Liquidators' investigation, they understand that the insurance available to SGG BVI is "eroding".  That is, each dollar of insurance money that is spent defending claims brought by the Liquidators (or other parties, including the *Romay* and *Lopez* Claimants) will be (or has been) a dollar less of insurance available under the policies for settlement purposes.  This represents a particular risk given that, in the absence of approval of the Settlement Agreement, SGG will be litigating against the Liquidators, as well as at least two other plaintiff groups in the Florida Lawsuits.  The Liquidators believe that it is likely that, in the absence of a settlement, the potential insurance that may be available to fund any adverse judgment may be less than the total proceeds available

to the Liquidators through the Settlement Agreement.  Thus, this factor likewise favors approval of the Settlement Agreement.

66.    The third factor – the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attendant to it – also supports approval of the Settlement Agreement.  *In re Gaddy*, 851 F. App'x at 1002 (recognizing that "[t]he bankruptcy court [is] not required to predict the future; it [is] required to identify potential difficulties in collection" and finding those concerns "coupled with the possibility of costly and protracted litigation [] support[ed] the bankruptcy court's decision to approve the settlement") (citing *In re Chira,* 567 F. 3d at 1312-1313 (affirming bankruptcy court's approval of settlement when the trustee decided to settle "[r]ather than litigate their dispute over [an] arcane and uncertain legal issue . . . [while] fac[ing] the possibility of costly and protracted litigation").  The claims that the Settlement Agreement resolves are exceedingly complex and would require substantial time to resolve, both as a procedural and as a substantive matter.

67.    Procedurally, the Note Issuers are Cayman Islands entities and the Notes are governed by Cayman Islands law.  The individuals who served as directors of the Note Issuers on behalf of SGG BVI are located in Curaçao.  The Management Agreements and addendums thereto between the Note Issuers and SGG BVI contains a British Virgin Islands choice of law clause.  Witnesses in any trial would likely come from each of these jurisdictions, as well as others, including the United States.  Certain of these potential witnesses are also currently under indictment or have already pled guilty, complicating their appearance for testimony while incarcerated.  In other words, the purely procedural aspects of litigation against SGG are exceedingly complex, litigation necessarily will be expensive and time consuming.

68.     Substantively, any litigation against SGG will be equally complex.  As described above, the Biscayne Capital Scheme took place over many years, across many jurisdictions, and involved hundreds of victims.  SGG served as a director for the Note Issuers until 2018 – which covers almost all of the relevant periods in which the Biscayne Capital Scheme was perpetrated and the losses were incurred.  Any litigation against SGG necessarily will require that SGG and its actions over this multi-year period be analyzed and any defenses to its potential liability be successfully overcome.  *See In re Se. Banking Corp.*, 314 B.R. 250, 273 (Bankr. S.D. Fla. 2004) (approving settlement upon finding that "[t]he evidence shows that the [litigation] presented myriad factual and legal issues . . . on a number of different claims and defenses [that] would be expensive to litigate . . . [for] several years.").  While, as noted above, the Liquidators have confidence in the merits of their claims, those claims – which currently have not been filed – would be complex to litigate, (against sophisticated counsel that already has successfully secured dismissal of a complaint against SGG) as well as time consuming and expensive to pursue.  Thus, the third factor, both procedurally and substantively, also supports approval of the Settlement Agreement.

69.     The fourth factor – the paramount interest of the creditors and a proper deference to their reasonable views – also supports approval of the Settlement Agreement.  Among other things, the Ad Hoc Committee, which acts as a voice for the creditors in the Liquidations, supports entry into the Settlement Agreement.  Similarly, the Cayman Court has sanctioned (*i.e.*, authorized) the Liquidators' entry into and performance under the Settlement Agreement.  As the court where the Note Issuers have their center of main interests and the court that oversees the Liquidations at the broadest level, the Liquidators believe that it is appropriate to give deference to that court's judgment in assessing the "paramount interests of creditors."

70.    There are other substantial reasons to conclude that entry into and performance

under the Settlement Agreement is consistent with the paramount interest of creditors.  As

discussed above, the Settlement Agreement ensures that plaintiffs seeking recovery for losses

associated with investments with non-Note Issuers, such as IA Capital and Madison, do not

obtain a windfall recovery that would undermine the ability of the Liquidators to recover and

distribute proceeds fairly, equitably, and impartially for the benefit of all Noteholders.  Standing

alone, the consideration provided under the Settlement Agreement is substantial.  Indeed, based

upon where these Liquidations stood at the commencement of these Chapter 15 Cases – with no

money, few hard assets, and extraordinarily complex claims to investigate – the Settlement

Agreement represents a singular achievement.  *Francisco*, 2008 WL 649124, at *10 (finding

"with many possible outcomes, extensive delay, and considering the time value of money" and

"[b]alancing the uncertainties of continued litigation . . . including the possibility of zero

recovery – the settlement is clearly fair, reasonable, and adequate").  Furthermore, it is

appropriate for the Court to give deference to the Liquidators' business judgment.  *See United

States v. Hartog,* 597 B.R. at 682.  In the Liquidators' view, entry into the Settlement Agreement

maximizes the likely net recovery from claims against SGG, taking into account all relevant

factors, including the availability of insurance, the costs of liquidating the claims, and the risks

associated with non-collectability of any judgment.

71.    For these reasons, entry into the Settlement Agreement is a sound exercise of

business judgment and should be approved under applicable precedent.  *See In re Morgan*, 2011

WL 13185742, at *4-5 (affirming approval of settlement agreement recognizing that

"[c]ompromises are generally approved [if] they meet the business judgment of the trustee" and

crediting the "Trustee and Trustee's counsel[s'] expla[nation] that they had engaged in extensive

negotiations to reach the settlement agreement and that they believed that it was reasonable and in the best interest of the creditors." (citation omitted)) *aff'd* 439 F. App'x 795, 795 (11th Cir. 2011) (*per curiam*) (affirming bankruptcy court's approval of settlement agreement and finding "[t]he bankruptcy court approved the settlement because it was the Trustee's best business judgment that the settlement be approved [and] [w]e find no basis in the record for questioning the Trustee's judgment").

**B. The Bar Order Is Fair and Equitable, Essential to the Settlement Agreement, and Within the Jurisdictional Authority of the Court.**

72.     As a condition precedent to payment of the Settlement Amount, SGG requires entry of the Chapter 15 Approval Order, which, in material part, imposes the Bar Order.  The Bar Order is (i) essential to the Settlement Agreement; (ii) appropriate in order to achieve the finality and repose that is contemplated under the Settlement Agreement; (iii) within the sound jurisdiction and authority of the court; and (iv) fair and equitable in its scope, application, and purpose.  The Bar Order satisfies the conditions required by the Eleventh Circuit for entry thereof.  *See In re Oil & Gas Litig.*, 967 F.2d 489, 493-96 (11th Cir. 1992); *Munford, Inc. v. Munford, Inc.*, 97 F.3d 449, 455-56 (11th Cir. 1996).

*i.     The Court Has Subject Matter Jurisdiction To Enter the Bar Order.*

73.     The scope of the Bar Order is appropriately tailored to matters over which this Court has subject matter jurisdiction.  "For the Bankruptcy Court to exercise subject matter jurisdiction, there must be 'some nexus' between the barred claims and the bankruptcy case." *Hartog*, 597 B.R. at 679 (citing *In re Land Res., LLC*, 505 B.R. 571, 578 (M.D. Fla. 2014) (citing *Munford*, 97 F.3d at 453)).  The proper test is "whether assertion of the claims proposed to be barred could conceivably have an effect on the estate being administered in bankruptcy." *Id.* (internal quotations omitted).  Barred claims are sufficiently related to the bankruptcy case "if

the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Id.*

74.    Here, the Bar Order proposes to bar "Barred Claims."  There are two categories of "Barred Claims."  First, a Barred Claim is any claim that "(a) could be asserted, pursued, settled or compromised by the Liquidators or that seeks redress for a loss suffered by, or harm done to, the Note Issuers . . . that arises out of or relates to the Biscayne Capital Scheme, … and (b) that could be brought in any United States federal or state court…"

75.    By definition, this first category of Barred Claims *must* have a "conceivable effect" on the debtors (*i.e.*, the Note Issuers).  The Barred Claims are limited to those that could be pursued by the Liquidators or that seek some form of recovery for harm done to the Note Issuers.  This limits the scope of Barred Claims to derivative claims.  Because the scope of the Bar Order relates only to derivative claims, any litigation, settlement, or other pursuit of such claims must impact the debtor's "rights, liabilities, options, or freedom of action . . .." *Munford*, 97 F. 3d at 453.  Therefore, the Court has subject matter jurisdiction to enter the Bar Order with respect to this category of Barred Claims.

76.    The second category of Barred Claims captures "any claim for contribution, indemnity, or reimbursement against one or more Protected Persons arising out of or related to any Cause of Action that arises from or relates to the Biscayne Capital Scheme."  Such claims are exactly the sort of claims that were at issue in *Munford*.  *See Munford*, 97 F.3d at 453. There, the Eleventh Circuit found that the analysis "is not difficult."  *Id*. at 454.  Because the settling defendant conditioned its entry into the settlement agreement on the barring of claims for contribution, reimbursement, and indemnity, the Eleventh Circuit found that the debtor would

have lost its "option" to settle with the defendant and receive the settlement proceeds in the absence of the bar order. *Id.* The loss of this option was a sufficient basis for the bankruptcy court to exercise subject matter jurisdiction to enter the bar order.

77. The second category of Barred Claims thus presents essentially an identical situation to that in *Munford*. SGG will not agree to settle with the Liquidators (and pay the substantial Settlement Amount) without receiving comfort that it will not be subject to liability from non-settling co-defendants. *See* Settlement Agreement § 20. Thus, the Court has subject matter jurisdiction over this second category of claims that are "Barred Claims" under the Settlement Agreement.

ii. *The Court Has Statutory Authority To Enter the Bar Order.*

78. Section 105(a) authorizes a bankruptcy court to enter an appropriate bar order. *In re Jiangbo Pharm., Inc.*, 520 B.R. 316, 323 (Bankr. S.D. Fla. 2014) ("When a requested bar order is interrelated with a trustee's claim, an essential and critical element of the settlement, necessary to achieve complete resolution of the issues within the settlement agreement, and fair and equitable, then the entry of a bar order is a proper exercise of the Court's power under section 105."); *In re Adler*, 2010 WL 3743885, at *7 (Bankr. S.D. Fla. Sep. 16, 2010) ("A bar order is consistent with the pronouncement of the Eleventh Circuit in *Munford* and *In re U.S. Oil and Gas Litigation*, 967 F.2d 489 (11th Cir. 1992), and therefore, entry of a bar order is proper pursuant to 11 U.S.C. § 105(a) . . ..."). The Eleventh Circuit has acknowledged the essential role that bar orders play in assisting in the settlement of complex litigation that:

> can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive. Accordingly, the Federal Rules of Civil Procedure authorize district courts to facilitate settlements in all types of litigation. . . .. *[B]ar orders play an integral role in facilitating settlement. Defendants buy little peace through settlement unless they are assured that they will be protected against codefendants' efforts to shift their losses through cross claims for indemnity, contribution, and other*

36

> *causes related to the underlying litigation. . . . We believe that these principles*
> *strongly support the district court's decision to enter a settlement bar order.*

*In re U.S. Oil & Gas Litig.,* 967 F.2d at 493-94 (upholding district court's entry of bar order in

class action settlement on abuse of discretion standard) (emphasis added); *In re Fundamental*

*Long Term Care, Inc*., 492 B.R. 571, 576 (Bankr. M.D. Fla. 2013) ("The Eleventh Circuit . . .

explained [in *Superior Homes*] that it previously ruled in *Munford* that bankruptcy courts had

jurisdiction to bar third-party lawsuits that could conceivably affect the handling and

administration of the bankruptcy estate . . . because it [] prevented creditors from making 'an

end-run around the normal bankruptcy procedure for distribution of the Estate.'") (citing *Apps v.*

*Morrison* (*In re Superior Homes & Invs., LLC)*, 2013 WL 2477057, at *2–3; *Munford*, 97 F.3d at

454-55 (upholding bankruptcy court's entry of settlement bar order on abuse of discretion

standard)).[22] *Zacarias v. Stanford Int'l Bank, Ltd*. 945 F.3d 883, 896, 905 (5th Cir. 2019)

(finding, in the context of the Stanford Ponzi scheme, that "[t]he receiver, standing in the shoes

of the injured corporations, is entitled to pursue the corporation's claims 'for the benefit . . . of

innocent investors' . . . [and] is [] allowed to curb investors' individual advantage-seeking in

order to reach settlements for the aggregate benefit of investors under the court's supervision . . ..

Th[is] role is undermined if investor-claimants jump the queue, circumventing the receivership

in an attempt to recover beyond their pro rata share . . .  [and] [thereby] frustrate [its] central

---

[22] This is particularly true in the context of Ponzi schemes where all investors generally suffer substantially the same harm, as a result of the same acts, by the same principals, because of the same scheme.  *See generally, e.g., In re IFC Credit*, 458 B.R. 911, 918 (N.D. Ill. 2011) (enjoining three related Ponzi scheme suits though admittedly "not identical" because they were all "trying to disgorge the same funds," by "alleg[ing] the same wrongdoing by the same parties" "arising out of the [same] Wildwood Ponzi Scheme.") (citing *Fisher v. Apostolou*, 155 F.3d 876, 883 (7th Cir. 1998)).  In this context, it also serves to "undermine" the fiduciary's ability to distribute *pro rata* for the benefit all injured investors.

purpose . . to achieve maximum recovery from the malefactors for distribution pro rata to all investors").

79.     Section 1521 of the Bankruptcy Code provides additional statutory support for entry of the Bar Order.  Under that section, upon recognition of a foreign proceeding, the Bankruptcy Code may, "at the request of the foreign representative, grant any appropriate relief where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a).  This specifically includes entry of an order "staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a)" and granting "any additional relief that may be available to a trustee [with the exception of avoidance actions]."  *Id*. § 1521(a)(1), (7).

80.     Finally, the All Writs Act, 28 U.S.C. §1651, provides further statutory authority for the Court to enter the Bar Order.  The All Writs Act authorizes federal courts to "issue all writs necessary and appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651.  This includes the authority "to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *Miller v. Brooks* (*In re Am. Honda Motor Co., Inc., Dealerships Relations Litig*.), 315 F.3d 417, 437-38 (4th Cir. 2003) (internal quotations omitted) (quoting *Penn. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 40 (1985)).

81.     Under the All Writs Act, "the [C]ourt has the power to extend [an] injunction to third-parties who are not parties to the action…  [T]he Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in

wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice and encompasses even those who have not taken any affirmative action to hinder justice." *SEC v. Parish*, 2010 WL 8347143, at \*5 (D.S.C. Feb. 10, 2010).

82.    Therefore, in addition to having subject matter jurisdiction to enter the Bar Order, the Court also has statutory authority to do so.

   *iii.*     *Entry of the Bar Order Is Necessary To Effectuate the Settlement Agreement and Appropriate under Applicable Eleventh Circuit Precedent.*

83.    The Eleventh Circuit permits a bankruptcy court to enter a bar order either to facilitate a reorganization or where entry of a bar order is necessary to facilitate a settlement of litigation.  *See Markland v. Davis (In re Centro Grp., LLC)*, 2021 WL 5158001 at \*9 (11th Cir. Nov. 5, 2021).  Bar orders that are necessary to facilitate a settlement are governed by the rules set forth in *Munford.  Id.*  It is not (or should not be) contested that *Munford* provides the proper frame of reference to analyze the Bar Order here.[23]

84.    The *Munford* "factors" are the following:

  a.    The interrelatedness of the claims that the bar order precludes;

  b.    The likelihood of non-settling defendants to prevail on the barred claim;

  c.    The complexity of the litigation; and

  d.    The likelihood of depletion of the resources of the settling defendants.

*Munford*, 97 F.3d at 455.

85.    Additionally, to enter a bar order to facilitate settlement in the Eleventh Circuit, the bankruptcy court must determine that the bar order is "essential" to the settlement.

---

[23] *See, e.g., In re Solar Cosmetic Labs, Inc.*, 2010 WL 3447268, at \*4 (Bankr. S.D. Fla. Aug. 27, 2010) (recognizing that under binding Eleventh Circuit precedent in *Munford* and *Lemco Gypsum* a bankruptcy court has "authority to impose and enforce a bar order on a non-settling defendant.") (citing *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.*), 910 F.2d 784, 788 (11th Cir. 1990) (recognizing under the Eleventh Circuit's formulation of the test that "[t]he proceeding need not necessarily be against the debtor or against the debtor's property").

86. The essential nature of the Bar Order to the Settlement Agreement is analyzed below, together with the *Munford* factors.

a.   <u>The Bar Order Is Essential To the Settlement Agreement.</u>

87. To enter a bar order in the context of a settlement agreement, the Eleventh Circuit requires that a court conclude that the bar order is "essential." *Markland v. Davis, (In re Centro Grp., LLC)*, 2021 WL 5158001, at *3 (11th Cir. Nov. 5, 2021) (recognizing that "*Munford* applies where a bar order is *essential* to a litigation agreement") (emphasis added). A bar order is essential when it is "integral to [the] settlement." *Id.* The Eleventh Circuit interprets this to mean that the "parties would not have entered into the settlement" in the absence of a bar order. *Id.* ("The *Munford* factors apply to bar orders assessed in the settlement context" and "[s]uch a bar order is appropriate where the parties would not have entered into a settlement agreement without it, and thus it is 'integral' to the settlement."). The policy driving settlement bar orders also supports interpreting "essential" to mean essential to settling the litigation. *See In re Jiangbo Pharm., Inc*., 520 B.R. 316 at 324 (("Approval of the Bar Order, as an integral part of the Amended Settlement, facilitates and fulfills the long-standing public policy of encouraging pretrial settlements."); *In re First NLC Fin. Servs., LLC*, 2009 Bankr. LEXIS 1083, at *18 ("[S]ettlements and compromises are strongly favored for public policy reasons . . . [and] a bar order plays an essential role in facilitating settlements, as it provides defendants with 'peace' in the litigation [.]" (citations omitted)); *In re S & I Invs*., 421 B.R. 569, 585-86 (Bankr. S.D. Fla. 2009) (holding that "public policy considerations" support entry of the bar order because "public policy strongly favors pretrial settlement in all types of litigation" as litigation "can deplete the resources of the parties and the taxpayers for extended periods of time" and "litigation costs are particularly burdensome on the bankruptcy estate given the financial instability of the estate." (collecting cases)).

40

88.     Here, the Bar Order is essential to the Settlement Agreement and there is both

direct, objective, and circumstantial evidence to support this.  Objectively, from the face of the

Settlement Agreement, entry of the Bar Order is a *condition* to SGG paying the Settlement

Amount, which is substantial.   Section 7 of the Settlement Agreement provides that "*subject to*

satisfaction of all Conditions Precedent to Payment of Settlement Amount, SGG BVI shall pay

the Settlement Amount to the Liquidators…"  *See* Settlement Agreement § 7 (emphasis added).

The "Conditions Precedent to Payment of Settlement Amount" are defined to include that "the

Chapter 15 Approval Order *shall have been entered* by the Bankruptcy Court . . .."  *Id*. §

1(a)(xii).  The Chapter 15 Approval Order is, in turn, specifically defined to include entry of the

Bar Order.  *Id*. § 1(a)(viii).  Thus, if this Court does not enter the Bar Order, the Settlement

Agreement will not become effective.  Therefore, entry of the Bar Order is "essential."  *In re*

*First NLC Fin. Servs., LLC*, 2009 Bankr. LEXIS 1083, at *18 (holding, when the parties "would

not have agreed to the Stipulation without entry of the Bar Order" that "[t]he Bar Order was an

'integral' part of and material to the settlement dynamics" and "[t]herefore . . .  issuance of the

Bar Order is reasonable and appropriate in the circumstances."); *In re Superior Homes & Invs.,*

*LLC*, 521 F. App'x at 898-99.  (finding a bar order essential when "the Trustee would not have

received the $800,000 settlement in the absence of the Bar Order.").

89.     There is further objective evidence that entry of the Bar Order is essential to the

Settlement Agreement.  The compromise memorialized in the Settlement Agreement was

negotiated over many months and was guided by an internationally renowned mediator.   Each

side thoroughly analyzed applicable claims and defenses, each side's likelihood of success, and

the likely available recovery if claims were litigated.  This analysis included not only the

prospect of the payment of the Settlement Amount, but each of the other terms contained in the

Settlement Agreement, including the Bar Order.  Given the thoroughness of the analysis by each Party of its rights, as well as the extended period over which the settlement negotiations occurred – including the breakdown over certain of the terms of settlement in December 2021 and the termination of the tolling agreement in February 2022 – it would be unreasonable to assume that there were any "discretionary" parts of the Settlement Agreement that would not be a condition for either side.  Were there, that would have been clear to the mediator and it is reasonable to assume that he would have prevailed upon the parties to drop terms that might be "unnecessary," "discretionary," or "non-essential."

90.    Finally, there is evidence of the necessity of the Bar Order that one can fairly infer from context, including the other terms of the Settlement Agreement.  Most notably is the quantum of the Settlement Amount.  SGG will pay a total of $22.5 million under the Settlement Agreement.  This is a substantial amount, and it is unreasonable to assume that SGG would agree to make such a substantial payment if it were not being provided the relief offered by the Bar Order.   At the same time, the claims to be barred by the Bar Order are also narrowly, reasonably, and appropriately tailored.  The Bar Order will bar any claim that "could be asserted, pursued, settled, or compromised by the Liquidators," other claims that "seek[] redress for a loss suffered by, or harm done to, the Note Issuers," or claims for contribution, reimbursement or indemnity that could be brought by non-settling co-defendants.  It is not reasonable to believe that SGG would be settling for the amounts it is prepared to pay if it *didn't* resolve the Liquidators' Claims and those barred by the Bar Order.  Otherwise, SGG would essentially be agreeing to pay the Settlement Amount while still potentially being subject to having to litigate essentially identical claims against other parties.  Thus, there is direct, objective – as well as

substantial circumstantial - evidence to support the conclusion that the Bar Order as drafted is necessary for a settlement with SGG.

b.    <u>The Bar Order is Warranted under *Munford*.</u>

91.    The *Munford* factors are as follows:

    a.    The interrelatedness of the claims that the bar order precludes;

    b.    The likelihood of non-settling defendants to prevail on the barred claim;

    c.    The complexity of the litigation; and

    d.    The likelihood of depletion of the resources of the settling defendants.

92.    The first *Munford* factor is the interrelatedness of the claims to be barred with the claims to be settled.  The Eleventh Circuit has held that claims are interrelated (and therefore may be extinguished by a bar order) where the claims "arise out of the same facts as those underlying the litigation."  *In re  U.S. Oil & Gas Litig*., 967 F.2d at  496  (recognizing that "[t]he propriety of the settlement bar order should turn upon the interrelatedness of the claims that it precludes, not upon the labels which parties attach to those claims" and that "[i]f the []claims that the district court seeks to extinguish through the entry of a bar order arise out of the same facts as those underlying the litigation, then the district court may . . . bar such claims").  Similarly, the Eleventh Circuit also has held that claims for indemnification and contribution among co-defendants are sufficiently interrelated and can therefore be barred.  *See In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 860, 865 (11th Cir. 2009) (recognizing "in this Circuit, our decision in *In re U.S. Oil & Gas Litigation*, 967 F.2d 489 (11th Cir. 1992)[,] approved a bar order precluding 'claims for contribution or indemnity against the settling defendants'").

93.    The Bar Order covers two categories of interrelated claims.  The first will bar claims that "could be asserted, pursued, settled, or compromised" by the Liquidators or that

43

otherwise "seek redress for a loss suffered by, or a harm done to, the Note Issuers." Thus, on its face, the Bar Order can only bar claims that the Liquidators could themselves pursue or that otherwise seek redress for harm done to the Note Issuers.

94.    In addition to claims that Noteholders might later try to bring, each of the Florida Lawsuits that will be subject to the Bar Order is interrelated with the claims the Liquidators are settling with SGG. For instance, on its face, the *Lopez* FAC asserts, among other forms of relief, claims for breach of fiduciary duty against SGG. Nowhere in the *Lopez* FAC, however, are there any well-pled factual assertions that SGG: (i) owed any individual duty to those claimants (as distinct from the Note Issuers); or (ii) directed any of its acts or omissions towards any of those claimants (as distinct from other claimants or the Note Issuers themselves). Nor could there be when directors like SGG owe fiduciary duties only to the Note Issuers. *See, e.g., In re CIL Ltd.*, 2018 Bankr. LEXIS 354, at *27-28; *Q China Holdings*, 2018 N.Y. Misc. LEXIS 1554, at *10; *Wimbledon Fin. Master Fund,* 2017 N.Y. Misc. LEXIS 2725, at *49-50. Furthermore, the *Lopez* FAC itself is replete with assertions of the fraud that was committed by the Principals and other defendants *on the Note Issuers*. The loss for which the *Lopez* Claimants seek redress is the same loss suffered by the *Note Issuers* that has rendered the Note Issuers unable to repay the amounts owed to *all Noteholders*. In other words, the facts that are at the center of the proposed settlement between SGG and the Liquidators are not just similar to the facts alleged in the *Lopez* FAC. They are – as is generally the case in the context of a Ponzi scheme – the same facts. [24]

---

[24] *See In re Barkany*, 542 B.R. 662, 691 (Bankr. E.D.N.Y. 2015) ("Bankruptcy provides a mechanism for (a) creating a bankruptcy estate through the recovery of assets that were transferred pursuant to, or generated from the proceeds of, a Ponzi or such other fraudulent scheme perpetrated by a debtor and (b) treating all similarly situated creditors of a debtor's fraudulent scheme equally . . . Without . . . the exclusive standing given to the chapter 7 trustee to pursue these third-party claims, [Ponzi scheme] victims, free to pursue claims against third parties for a common injury arising from a pervasive fraudulent scheme, would 'convert the bankruptcy proceedings into a race to the courthouse,' and effectively 'derail the bankruptcy proceedings.'") (citing *Fisher v. Apostolou*, 155 F.3d 876, 883 (7th Cir. 1998) (finding the key question was "whether the overlap between the claims of the debtor [] and the

Therefore, they are sufficiently interrelated to be capable of being barred under applicable, binding Eleventh Circuit law.

95.    The claims asserted against SGG in the *Romay* SAC also are sufficiently interrelated with the Liquidators' Claims to be properly subject to the Bar Order.

96.    The allegations against SGG in the *Romay* SAC are similar to the allegations in the *Lopez* FAC and those asserted facts arise out of the same facts that are at the heart of the Settlement Agreement.  Specifically, the central allegation in the *Romay* SAC is that the Principals directed the *Romay* Claimants' money into the purchase of Notes.  The damages that are alleged in the *Romay* SAC arise *only* because the Note Issuers do not have sufficient assets to repay the Notes in full.  In other words, but for being Noteholders in the Note Issuers, the *Romay Claimants* would not have suffered a loss.

97.    The facts alleged against SGG in the *Romay* SAC relate to SGG's actions directed at the Note Issuers, which actions, it follows, harmed *all* Noteholders similarly by rendering the Note Issuers incapable of repaying the Notes.  While the Liquidators might frame their presentation of the facts differently than the *Romay* Claimants do, and do not accept all allegations in the *Romay* SAC as true, the underlying conduct is the same conduct that the Liquidators propose to settle with SGG.  Therefore, the claims that the Bar Order seeks to enjoin with respect to the *Romay* SAC are interrelated with the claims the Liquidators seek to settle to make issuance of the Bar Order appropriate.

---

claims of the creditors [] against third-parties [] are so closely related that allowing the creditors to" proceed forward with parallel litigation would "convert the bankruptcy proceeding into a race to the courthouse" and finding it "difficult to imagine how those claims could be more closely 'related to' . . . [when] they are claims to the *same limited pool of money, in the possession of the same defendants, as a result of the same acts, performed by the same individuals, as part of the same [Ponzi scheme] conspiracy*") (emphasis added).

98.     For example, in *In re Adler*, 2010 WL 3743885, at *6 (Bankr. S.D. Fla. Sep. 16, 2010), the bankruptcy court approved a settlement agreement and bar order "enjoining any party from suing [certain non-debtors] from any matter arising from or relating to claims against or investments with [the] Rothstein's Ponzi scheme in accordance with the authority granted the Bankruptcy Court." The bankruptcy court held that it had "subject matter jurisdiction to enjoin claims against [non-debtors], because such claims (i) are interrelated with claims which have been or could be asserted by the Trustee, and (ii) impact the administration of the Debtor's bankruptcy estate." *Id.* (citation omitted). The court reasoned that "[t]he practical reality" was that "absent the entry of a bar order [] funds that would otherwise be available to creditors . . . could [] be dissipated or forfeited. Given the pending and threatened litigation in state and federal court, 'nobody wins' by denying a bar order [and] [i]t is the Trustee's obligation to maximize recovery in the most efficient manner." *Id.* at *7. Similarly, in another Ponzi scheme case, *Peterson v. Ellerbock Family Trust, LLC.* (*In re Lancelot Inv'rs Fund, L.P.*, 408 B.R. 167, 174 (Bankr. N.D. Ill. 2009), the bankruptcy court granted the trustee's motion to enjoin related litigation by investors finding "[s]uccessful litigation against [non-debtor third-parties] would affect the amount of property the Trustee could collect to administer to the estate's creditors. Enjoining [such] litigation promotes the general policies of bankruptcy of allowing an orderly administration of the estate and pro rata recovery by the creditors. Conversely, allowing [third parties] to proceed with [their] suit[s] would encourage 'a race to the courthouse [that] would derail the bankruptcy proceedings' that bankruptcy is intended to prevent." *Id.* Lastly, in *Fox v. Picard* (*In re Madoff*), 848 F. Supp. 2d 469, 490-91 (S.D.N.Y. 2012), the court found that "the enjoined claims are dependent on and identical in substance to the claims that are being settled" and, on that basis, held that "[a]llowing the Florida Actions to go forward would carry real risks to the estate, implicating the viability of

the current settlement and the possibility of future settlements, and providing an avenue for BLMIS

customers who are displeased . . . [to] directly pursu[e] claims that are wholly derivative of claims

already brought by the Trustee . . ..”

99.     The second category of claims that the Bar Order seeks to enjoin are claims of

non-settling co-defendants against SGG for contribution, indemnity, and reimbursement related

to the Biscayne Capital Scheme.  As the court in *In re HealthSouth Corp. Sec. Litig.* found, such

claims are sufficiently interrelated to be properly subject to a bar order.  *See* 572 F.3d at 865.

Therefore, all claims proposed to be subject to the Bar Order are sufficiently interrelated to the

matters the Liquidators seek to settle to satisfy the first factor in the *Munford* test.

100.     The second factor set forth in *Munford* is the likelihood that the parties to be

barred will succeed on the merits of their claims in the absence of entry of the bar order.  For

purposes of considering this factor, the Liquidators focus only on the Florida Lawsuits, the two

civil actions that are pending against SGG.  Several points support entry of the Bar Order

through this lens.  Principally, it is undisputed that the only court that has yet assessed the

allegations in the *Romay* SAC – the Complex Business Litigation Section of the Circuit Court for

the Eleventh Judicial Circuit – found that it lacks personal jurisdiction over SGG and dismissed

the case against it.  That order is on appeal and as of the date of this Motion, Florida’s Third

District Court of Appeals has not issued a ruling.  Similarly, the same Circuit Court judge for the

Eleventh Judicial Circuit stayed the *Lopez* Lawsuit pending resolution of the appeal based on its

ruling in the *Romay* Lawsuit.  Thus, neither of the Florida Lawsuits have made it past SGG’s

jurisdictional motions to dismiss.  And, at this point, absent a reversal of the order dismissing the

*Romay* Lawsuit by the Third District Court of Appeals, it is unlikely that either of the Florida

Lawsuits will *ever* proceed against SGG, much less be successful.

101.    Similarly, even if – hypothetically – the Third District Court of Appeals overturned the dismissal of the *Romay* Lawsuit, it is questionable whether either of these actions would have any merit as against SGG.  First, the trial court dismissed the *Romay* Lawsuit on personal-jurisdiction grounds before addressing any substantive arguments by SGG.  Thus, SGG would, if the case were reversed, have the opportunity to seek to dismiss the claims of the *Romay* and *Lopez* Claimants based on substantive arguments that go to the heart of the *Romay* and *Lopez* Claimants' causes of action against SGG.  Thus, even if the *Romay* dismissal order is reversed, there is no assurance that either plaintiff group will survive a motion to dismiss on the merits, much less ultimately succeed on the merits.

102.    Second, and as set forth above, these claims are derivative (or, in the case of the *Lopez* FAC, assert claims for breach of fiduciary duty that are property of the liquidation estates of the Note Issuers).  They are founded on SGG's omissions as director of  the Note Issuers that rendered the Note Issuers unable to repay the Notes in which these parties invested.  As a result, it is unclear how these parties could establish that SGG owed them some individualized duty, as distinct from the duties that SGG owed to the Note Issuers.  *See Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81, 96 (2d Cir. 2014) (recognizing "'derivative claims' [] as ones that 'arise[] from harm done to the estate' and that 'seek[] relief against third-parties that pushed the debtor into bankruptcy" and holding that defrauded investors "claims are [] 'derivative' of the Trustee's: they are predicated upon mere secondary harms flowing from [the Madoff Ponzi Scheme]" because the barred parties were "not alleged to have made any misrepresentations to induce investments in [the Ponzi scheme] or to have taken any other actions that could reasonably be understood as aimed at BLMIS customers [i.e., investors.]").  If they fail to establish a duty, they will not succeed in their respective actions.  Moreover, the

statute of limitations may bar many of the Florida Lawsuits' claims, RICO may not apply extraterritorially, causation may present challenges, and the foregoing assumes that the Florida Lawsuits as to claims against SGG would be permitted to avoid this Court's bankruptcy stay, which is sought by the Liquidators concurrently herewith. For these reasons, the second *Munford* factor – the likelihood of success in the absence of entry of the bar order – also supports entry of the Bar Order.

103.    The third *Munford* factor – the complexity of the litigation – similarly supports entry of the Bar Order. The Liquidators believe that it is undisputed – and indisputable – that the litigation involving the international Biscayne Capital Scheme is extraordinarily complex. As discussed above, it has involved exhaustive investigation and review of over eight million documents, dozens of witness interviews, and, at its core, encompasses an elaborate Ponzi scheme taking place over a decade, spanning multiple jurisdictions, involving dozens of corporate entities, and implicating highly complex factual and legal issues. The complexity of the litigation makes it particularly appropriate and important for the Court to enter a tailored bar order in the right circumstances, such as the one that is requested here. A bar order is a critical tool to address the collectivized injury that victims of the Biscayne Capital Scheme have suffered. Without the Bar Order, it is likely that (a) the Liquidators will be unable to maximize recoveries for the collective benefit of all similarly situated victims, and (b) some enterprising parties who are *not* in fact creditors will attempt to use the complexity of the litigation to essentially earn a windfall recovery.

104.    These dynamics already are clear in the pending Florida Lawsuits. Without the Bar Order in place, it is possible that SGG would need to litigate different claims against different parties all arising from the same operative set of facts. Essentially, SGG would have to

litigate and re-litigate what SGG allegedly did (or failed to do) with respect to the Note Issuers, and the damages arising with respect to those acts or omissions, while insurance policies are depleted. Faced with this litigation reality, without the benefit of the Bar Order, there is no reasonable prospect that SGG ever could maximize the amount it would pay in settlement to any claimant, because it would have to continue to litigate the same facts and the same issues with another claimant. In other words, in the absence of the Bar Order, *all* claimants are worse off – the money that can be collectivized and pooled in a single settlement with the Bar Order will instead be spent on litigation fees defending against all claimants. By entering the Bar Order, the Court will facilitate the Liquidators maximizing recoveries from SGG and equitably distributing those proceeds to *all* claimants with a legal entitlement to them. Accordingly, entry of the Bar Order is warranted because of the complexity of the litigation that it seeks to resolve, the third *Munford* factor.

105. The fourth and final *Munford* factor is the likelihood of depletion of the defendant's assets in the absence of entry of the Bar Order. This factor similarly favors entry of the Bar Order. Based upon the Liquidators' investigation, the insurance assets available to fund a judgment against SGG are limited and depleting. *See, e.g., In re Jiangbo Pharm., Inc*., 520 B.R. 316 at 325 (approving settlement and bar order and finding that "continued litigation" would "serve to [] substantially deplete the resources of the Estate with significant litigation costs" as well as deplete "the remaining available insurance proceeds" necessary to satisfy a judgment).[25] Indeed, the limited (and depleting) nature of the available insurance assets explains

---

[25] *See also generally SEC v. Faulkner,* 2021 U.S. Dist. LEXIS 167083, at *26-27 (N.D. Tex. Sep. 2, 2021) ("Under similar circumstances [with the] 'Stanford-Ponzi-scheme[ ]' . . . the Fifth Circuit in *Zacarias* explained . . . every dollar the Plaintiffs-Objectors recover from [the third-party brokers] is a dollar that the receiver cannot, frustrating the receiver's pro rata distribution to investors . . . . [The brokers] negotiated for the bar orders as preconditions of their respective settlements. The brokers' incentives to settle are reduced—likely eliminated—if each . . . investor

why the Liquidators are prepared to accept a Settlement Amount that it is far less than the total losses suffered by creditors of the Note Issuers (and far less than what the Liquidators would pursue against SGG in litigation). The limited (and diminishing) insurance assets – together with the uncertainty associated with collecting other assets available to satisfy a judgment against SGG – both justifies approval of the Settlement Agreement *and* justifies the Bar Order. If the Court does not enter the Bar Order, there is a certainty that those limited insurance assets will be further diminished in continuing the Florida Lawsuits (as well as the Liquidators' Claims, which they will bring if this Settlement Motion is not approved).

106.    This assessment by the Liquidators is supported by the fact that the Ad Hoc Committee has approved the Liquidators' entry into the Settlement Agreement on the proposed terms. Additionally, it is also relevant that the Cayman Court has approved the primary commercial terms of the Settlement Agreement (including the Liquidators' determination that it is appropriate to condition the effectiveness of the Settlement Agreement on entry of the Bar Order by this Court). For these reasons, the Liquidators submit that this fourth and final factor in the *Munford* analysis also favors entry of the Bar Order.

107.    Based on the foregoing, the Liquidators submit that each of the *Munford* factors supports entry of the Bar Order. Furthermore, while it does not fit squarely within any of the enumerated *Munford* factors, it is appropriate for the Court to consider the overall context of the Florida Lawsuit in assessing the request for entry of the Bar Order. Specifically, there are *substantial* numbers of claimants in the *Lopez* Lawsuit who, by their own admission, never

---

retains an option to pursue full recovery in individual satellite litigation . . .  [Here,] [r]egardless of Rothstein Kass's ability to pay both the Receiver's settlement amount and the amount the Jinsun Plaintiffs seek in the Jinsun Action, continued litigation in both of these lawsuits will be expensive (potentially depleting funds available under Rothstein Kass's 'wasting' insurance policy) and cannot guarantee that the Receiver will ever recover, for the benefit of the receivership, the $7 million he has negotiated in settlement.") (citing *Zacarias v. Stanford Int'l Bank, Ltd.* 945 F.3d 883, 896, 905 (5th Cir. 2019)).

invested in Notes. Their claims are against Madison or are related to IA Capital Notes. *There is no evidence that SGG ever was involved in either of these structures*. These *Lopez* Claimants, who assert that they are owed approximately $41.67 million from obligors other than the Note Issuers seek recovery from SGG, *a stranger to those structures.*

108.     The reason courts in the Eleventh Circuit permit bar orders – indeed, in appropriate circumstances, encourage them – is because they maximize recoveries for creditors. They do this in a variety of ways. Sometimes they target the creditors they are intended to help, by stopping a race to the courthouse. In other situations, they stop interlopers who have no legitimate claim against a particular defendant from harassing that defendant in litigation (and thereby diminish the assets available to fund a settlement for legitimate creditors). Here, the Bar Order serves both purposes. There *are* legitimate creditors of the Note Issuers that the Bar Order seeks to target and does so appropriately for the reasons set forth above. But there are also parties who are not legitimate creditors of the Note Issuers who are pursuing SGG without a legal right to do so. These are the *Lopez* Claimants who claim that they are owed $41.67 million but admit that they never invested in the Note Issuers. It is appropriate for the Court to enter the Bar Order to enable the Liquidators to effectuate the Settlement Agreement for the benefit of legitimate creditors of the Note Issuers, by ensuring that SGG will no longer be faced with having to defend against claims brought by *Lopez* Claimants who are strangers to SGG.

109.     For these reasons, the Liquidators request that the Court enter the Bar Order, which is appropriately structured and is an essential part of the Settlement Agreement.

## CONCLUSION

110.     For the reasons set forth herein, the Liquidators respectfully request that the Court enter the Proposed Order attached hereto as **Exhibit A** (a) approving the Settlement Agreement,

(b) issuing the Bar Order, and (c) granting such other and further relief as the Court deems just and proper.

Respectfully submitted this 31st day of May 2022.

**EFR LAW FIRM**

*/s/ Eduardo F. Rodriguez*
Eduardo F. Rodriguez
(Florida Bar No. 36423)
1 Alhambra Plaza, Suite 1225
Coral Gables, Florida 33134
(305) 340-0034 (Telephone)

and

**ALSTON & BIRD LLP**

William Sugden
(*Admitted pro hac vice*)
Leah Fiorenza McNeill
(*Admitted pro hac vice*)
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 881-7000 (Telephone)

*Attorneys for the Joint Official Liquidators (in their capacity as Foreign Representatives)*